UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X  Docket#
SILVA,                        :  20-cv-00756-ARR-PK
              Plaintiff,      :
                              :
    - versus -                :  U.S. Courthouse
                              :  Brooklyn, New York
                              :
                              :
HORNELL BREWING CO., INC.,    :
          et al.              :  December 3, 2020
              Defendants      :  2:34 PM
------------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY CONFERENCE
BEFORE THE HONORABLE PEGGY M. KUO
UNITED STATES MAGISTRATE JUDGE

**A P P E A R A N C E S:**
(TELEPHONICALLY)


<u>**For the Plaintiff**</u>:          **Jeremy B. Francis, Esq.**
                           The Sultzer Law Group
                           270 Madison Avenue
                           Suite 1800
                           New York, NY 10016


<u>**For the Defendant**</u>:          **Howard S. Wolfson, Esq.**
                           **Gayle E. Pollack, Esq.**
                           Morrison Cohen
                           909 Third Avenue
                           New York, NY 10022


<u>**Transcription Service**</u>:      <u>**Transcriptions Plus II, Inc.**</u>
                           61 Beatrice Avenue
                           West Islip, New York 11795
                           laferrara44@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

Proceedings

1          THE COURT:  Civil Cause for Discovery

2     Conference by Telephone in the matter of Christopher

3     Silva v. Hornell Brewing Company, Inc., et al, docket

4     number 20-cv-756.  Magistrate Judge Peggy Kuo presiding.

5          Will the parties please state their

6     appearances, starting with plaintiff?

7          MR. FRANCIS:  Good afternoon, your Honor.

8          For plaintiff, this is Jeremy Francis with the

9     Sultzer Law Group, S-U-L-T-Z-E-R.

10          MR. WOLFSON:  Good afternoon, your Honor.

11          This is Howard Wolfson from Morrison Cohen for

12     the defendants.

13          MS. POLLACK:  Good afternoon, your Honor.

14          This is Gayle Pollack, also from Morrison Cohen

15     for the defendants.

16          THE COURT:  All right.  Good afternoon,

17     everyone.

18          I received a letter that was filed at docket

19     number 37 that raises discovery disputes that both sides

20     have with the other's responses.  This was filed now, was

21     dated November 20th, so I will turn to each one in turn.

22     I'll start with the plaintiff's requests that there be --

23     well, I guess I will call it a motion to compel

24     responses, and then I'll return to the defendants' motion

25     to compel.  Given that it's been over a week since this

Proceedings

1  was filed, if there are any updates, please fill me in on

2  that, as well.

3          So Mr. Francis, why don't you start?  Tell me

4  what exactly is still missing, and why you're entitled to

5  that information or those documents.

6          MR. FRANCIS:  Certainly.  Thank you, your

7  Honor.  I think from plaintiff's perspective, the short

8  answer is not much, if anything, has changed since the

9  submission of the letter, probably true for defendants,

10 as well.

11         Plaintiffs have not received any documents in

12 this case, nor has there been an agreement on a date to

13 exchange documents.  I've -- as you can see from the

14 letter, I've broken down the categories of documents and

15 information that the plaintiffs believe -- plaintiff

16 believes he is entitled to.  I can go through those if

17 you like, and each of the interrogatories and document

18 requests that would correspond to those broad categories.

19         You know, I don't want to belabor the point as

20 a lot of this is already set forth in the letter, but I'm

21 happy to go through it categorically if that's what you

22 would like.

23         THE COURT:  Well, I'm trying to figure out the

24 best way to resolve these issues for you.  So I see that

25 you're asking for information related to document --

Proceedings

1  related to other products sold by defendants, but I don't

2  know why that's relevant.

3            MR. FRANCIS:  Yes.

4            THE COURT:  So if you could just go through it

5  and tell me.

6            MR. FRANCIS: Sure.  Sure.  Absolutely.  Yes,

7  there are a few interrogatories, as well as document

8  requests related to other products sold by the defendant.

9  I think during our meet and confers, plaintiff agreed to

10  limit those requests to other products that defendant

11  sells that are labeled as "natural" or "all natural" or

12  any derivation thereof, as well as other what we'll call

13  "gummy" products sold by the defendants.  This is a case

14  involving chewable gummies.

15            And the reason that those documents and that

16  information is relevant is for a damages analysis in this

17  case, specifically a price premium analysis.  The best

18  and most direct way to do a price premium analysis is to

19  have appropriate comparable products.

20            So to the extent that defendant sells other

21  gummy products, other similar gummy products that are not

22  labeled as natural or all natural, or other products that

23  are not gummies that are so-labeled, that is relevant --

24  it's directly relevant to plaintiffs being able to

25  conduct such a price premium analysis.

Proceedings

1          And I mean, moving forward through the letter

2   that we've sent, we've also asked --

3          THE COURT:  Well, okay --

4          MR. FRANCIS:  -- for -- sure.

5          THE COURT:  So maybe, Mr. Francis, maybe the

6   best way to handle it is you --

7          MR. FRANCIS:  You want me to stop?

8          THE COURT:  -- (audio interference) these three

9   categories --

10          MR. FRANCIS:  Yeah.

11          THE COURT:  Well, these three categories relate

12  to the premium, right?

13          MR. FRANCIS:  When you say "three categories"?

14          THE COURT:  With the information about other

15  products -- well, I'm looking at your filling --

16          MR. FRANCIS:  Sure.

17          THE COURT:  -- it says documents related to

18  other products --

19          MR. FRANCIS:  Right.

20          THE COURT:  -- sales data for those products,

21  and then document related to how defendants determine

22  pricing.  So that is --

23          MR. FRANCIS:  That's right.

24          THE COURT:  -- the price premium -- the

25  premium.

Proceedings

1             MR. FRANCIS:  That's absolutely right.

2             THE COURT:  All right.  Okay.

3             MR. FRANCIS:  Each of those categories --

4             THE COURT:  So those are --

5             MR. FRANCIS:  -- relate to --

6             THE COURT:  -- the price premium damages.

7             MR. FRANCIS:  Correct.

8             THE COURT:  So then let's talk about what

9    defendant has to say about those.

10            MR. FRANCIS:  I'd also, just before you do so,

11   I'd also lump into that category, interrogatory number

12   11, which has to do with the identity of the retailers.

13   That is something that is necessary to us to determine

14   pricing of the products.  To the extent that defendants

15   don't have the retail pricing, and again, that would be

16   relevant to doing a damages and price premium analysis.

17            THE COURT:  Okay.  Is there anything else --

18   any other -- are there any other categories that fit into

19   this premium damages' argument?

20            MR. FRANCIS:  I don't believe so, your Honor,

21   no.  That conversation --

22            MR. FRANCIS:  Okay.  so why don't we take that

23   first?  Mr. Wolfson or Ms. Pollack?

24            MR. WOLFSON:  Thank you, your Honor.

25            First, let me just say Mr. Francis said that

Proceedings

1   they received no documents.  We haven't received any

2   documents either, so you know, neither side has produced

3   documents, and it's obvious why, because we have

4   disputes.  So I just don't want you to think that there's

5   been some one-way discovery here.

6               THE COURT:  I don't think --

7               MR. WOLFSON:  (Audio interference) to the --

8               THE COURT:  -- there is one-way discovery.  I

9   think the problem is --

10              MR. WOLFSON:  Yes.

11              THE COURT:  -- that there's no discovery and

12  that in itself is a problem.  So --

13              MR. WOLFSON:  Yeah.

14              THE COURT:  -- I wouldn't --

15              MR. WOLFSON:  I understand that.

16              THE COURT:  -- rest on that being a positive

17  thing, so --

18              MR. WOLFSON:  Yeah.  So let me turn to the

19  specific issue because I think this illustrates what the

20  problem is with discovery.  My client, Arizona Iced Tea,

21  makes literally hundreds of products, most of which are

22  beverage products.  The iced tea, fruit drinks, Arnold

23  Palmer drinks, and other drinks you see in various

24  outlets.

25              The product at issue in this case is a, I guess

1  you would call it a "fruit chew".  It has nothing to do

2  with the beverage products.  I think it's the only fruit

3  chew they make, though I am checking into that.

4         Just so you understand, your Honor, this is a

5  product that has very limited distribution anywhere in

6  the United States.  So they've asked us in discovery for

7  all of our pricing, and other proprietary, confidential,

8  and irrelevant information about hundreds of beverage

9  products that are not the subject of any claim in this

10  action.

11         And if you look at their own complaint, their

12  price premium damage claim is, they say that because we

13  put all natural on the label for this fruit chew, that

14  they paid more for the fruit chew product, than they

15  would have paid for what they call -- this is the term in

16  the complaint -- "comparable" fruit chew products that

17  didn't use the term all natural.

18         So their damage analysis is whatever they paid

19  -- you know, whatever Mr. Silva allegedly paid for our

20  product, and I'll just $1.50, and versus what he paid --

21  deduct what he paid for a comparable product, let's say

22  he paid $1.40, so their damage calculation would be ten

23  cents per package.

24         You know, the damage or price premium analysis

25  has absolutely nothing to do with what Arizona charges

Proceedings

1    for a 12 ounce can of iced tea, or a gallon container of

2    Arnold Palmer, or an 8 ounce bottle of water, or any of

3    those beverage products that aren't mentioned anywhere in

4    the complaint, and have absolutely nothing to do with the

5    claims that have been alleged.  That is our position,

6    your Honor.

7            THE COURT:  So -- all right.  So what I am

8    hearing is if you're looking for information as to the

9    premium that was paid, that a consumer would pay for a

10   product, this fruit chew product, above what a non-all

11   natural fruit chew product would be, the way to get that

12   is not by comparison to pricing information related to

13   iced tea product.

14           MR. WOLFSON:  That's correct, your Honor, and

15   as I said, we're talking about literally hundreds of

16   different iced tea fruit drinks and other products, in

17   all different sizes from a gallon down to 6 ounces.

18           THE COURT:  Uh-hum.

19           MR. WOLFSON:  The plaintiff's theory is I

20   could've bought -- and I'll just pick a name -- I

21   could've bought Welch's Fruit Chews that don't say all

22   natural for $1.40, but instead, I bought your product for

23   $1.50, and so the price premium was a dime.  That's the

24   damages.

25           Now, I will also tell you although I don't want

Proceedings

1 to jump too far ahead, we've asked them in discovery,

2 what is the comparable product that you allege in the

3 complaint you could have bought for less? And they've

4 not provided any answer for that, but they don't need

5 pricing about our gallon iced teas. Their damage claim

6 is based upon what Mr. Silva claims he paid for this, for

7 our product which he still hasn't told us, and --

8          THE COURT: Okay.

9          MR. WOLFSON: -- what he claims, he's either

10 paid in the past, or could have paid at that time for a

11 comparable product that wasn't labeled all natural.

12          THE COURT: Right. Okay.

13          MR. WOLFSON: Our other products --

14          THE COURT: So Mr. Francis --

15          MR. WOLFSON: -- could not be more utterly

16 irrelevant to this.

17          THE COURT: I hear you on that. You've said

18 that already. So Mr. Francis, why does the product

19 pricing for other products have anything to do with the

20 difference between what your client would've paid for an

21 all natural fruit chew, as opposed to a not all natural

22 fruit chew?

23          MR. FRANCIS: Well, I think we're talking about

24 two separate categories here. First of all, you know,

25 we've already stated that we've limited this request at

1  this point through the meet and confer to other products

2  that are either other gummy fruit chew products that

3  Arizona produces, which they may not, as defendant

4  asserted there, in which case there would be nothing to

5  get there, as well as other products they produce that

6  have some iteration of the term natural.

7          THE COURT:  Right.

8          MR. FRANCIS:  So --

9          THE COURT:  So that's the question.  That is

10  exactly the question, Mr. Francis.

11          MR. FRANCIS:  Right, understood.

12          THE COURT:  Other products being primarily

13  drinks, so why does whether a natural fruit drink, how

14  that is priced, why does that matter?

15          MR. FRANCIS:  The answer to that is because

16  while the most direct and relevant comparison at issue

17  here would be between a fruit chew labeled as natural,

18  and a fruit chew not labeled as natural.

19          There is also a sort of cross-check of sorts

20  that can be done between an Arizona product, say -- call

21  it an iced tea product that is labeled as natural, and

22  one that is labeled not all natural.

23          THE COURT:  All right.

24          MR. FRANCIS:  The pricing of those products if

25  it --

Proceedings

1          THE COURT:  I got it.

2          MR. FRANCIS:  If Arizona is pricing an all

3    natural iced tea ten cents higher than it prices a non-

4    all natural iced tea, that is an indication that they

5    consider the natural representation to be valuable to the

6    consumer, which is directly relevant to this case.

7          THE COURT:  Why does it matter what they think

8    is important?  Isn't it a question of what your client

9    suffered because it's a damages.

10          MR. FRANCIS:  It's an ultimate --

11          THE COURT:  So if your --

12          MR. FRANCIS:  That's right.  I mean --

13          THE COURT:  -- client is saying, okay -- if

14    your client says if I had known that this was not all

15    natural, I would not have paid the extra 10 cents or a

16    dollar, all right?

17          So the comparison there is between an all

18    natural product, and a non-all natural product, the same

19    thing, you can't -- unless he's saying, which is not what

20    he is saying, if I had known that there was some

21    difference, I wouldn't have bought a fruit chew, I would

22    have gotten an iced tea, right?

23          MR. FRANCIS:  Right.

24          THE COURT:  So that's not what he is saying.

25    So then these really are not relevant here at all.

Proceedings

1    MR. FRANCIS:  Well, I'm moving a little bit

2 beyond damages calculation here.

3    THE COURT:  Um-hum.

4    MR. FRANCIS:  The idea that they're going to

5 try to raise is a defense that they do not charge a

6 premium at all based on the word all natural, or that

7 consumers don't care, or simply won't pay more for

8 products that are all natural --

9    THE COURT:  But that's information --

10    MR. FRANCIS:  -- and their price --

11    THE COURT:  -- that you can get on your --

12 yeah, that has nothing to do with what this company is

13 doing because I am sure that your argument is going to be

14 the market itself prices differently, and you will bring

15 in other examples.  So whether there's -- and I mean, if

16 you have -- if this company makes a fruit chew or

17 comparable product that is not all natural, or not

18 labeled as such, you could get pricing for that, and then

19 if you found that that was priced lower, then you might

20 be able to say that it's different.

21    So that would be permissible, but not any other

22 product that's labeled all natural or not all natural

23 because you still don't have a -- you don't have a price

24 comparison because if all you're asking for is the

25 pricing information for everything labeled all natural,

Proceedings

1  you still don't have the pricing information for the

2  products that are not all natural in order to do that

3  price comparison. So it doesn't make sense to me --

4          MR. FRANCIS: Under --

5          THE COURT: -- that you're seeking this.

6          MR. FRANCIS: No, understood. We have perhaps

7  given up too much in agreeing to limit ourselves to all

8  natural.

9          THE COURT: Right, yeah. But it --

10         MR. FRANCIS: So that has --

11         THE COURT: Yeah. So by doing that, what

12  you've done is indicated to me that the information

13  you're seeking is not what you have now claimed, and so I

14  don't think it's relevant here. So that request to

15  compel is denied.

16         So let's move onto your next category. Why

17  don't you tell me what that has to -- how the relevance

18  argument plays out there.

19         MR. FRANCIS: Sure. So I mean, I don't know if

20  we have -- if we've covered interrogatory number 11,

21  which is the identity of the retailers, again this --

22         THE COURT: Yes, I don't find that relevant.

23         MR. FRANCIS: Okay.

24         THE COURT: If there's a specific need for your

25  contacting those retailers for something that's relevant,

1  maybe but at this point, you haven't laid out a basis.

2  All you've said is if the plaintiff don't have pricing

3  data for the product, it says here, pricing information

4  for the product, then you would try to get that from the

5  retailers, but I haven't seen or heard that the

6  defendants don't have pricing information for the

7  product.

8      MR. FRANCIS:  Understood.  So the next

9  category, a broad category, is the ingredients in the

10  products.  We've asked for descriptions of the

11  manufacturing process of the ingredients, identities of

12  the manufacturers, descriptions of the -- documents

13  sufficient to identify the formulation in the product,

14  and changes in those formulations over time, and this is

15  sort of repetitive of the interrogatory, but documents

16  sufficient to identify manufacturers as well.

17      THE COURT:  And why do you want this

18  information?

19      MR. FRANCIS:  So again, this information, and I

20  believe we discussed this a little bit during the meet

21  and confer, but how these ingredients are processed,

22  whether or not these ingredients would be considered

23  synthetic to a reasonable consumer, which is at the heart

24  of this case.  For some of these ingredients, at the very

25  least, will often depend on the manufacturing process.

Proceedings

1  There are ingredients that can be derived naturally,

2  which a consumer may or may not consider synthetic, and

3  then there are ingredients that the same ingredient can

4  be industrially produced in a manner that we would argue

5  renders it synthetic in the eyes of a reasonable

6  consumer.

7          So the manufacturing process is important in

8  the ultimate question of the case, whether these

9  ingredients are synthetic.  In order to determine how the

10 -- these are all questions designed to determine how

11 exactly these ingredients are processed -- are produced.

12          As far as the changes in the formulation, what

13 we're really looking for here are reasons for the changes

14 in these formulations.  One can envision, not that this

15 happens often, but can envision an email or a memorandum

16 asking for a change to an ingredient, or the change in

17 the way an ingredient is produced to make it more or less

18 natural in ways -- you know, for example, if they decided

19 to change their labeling to all natural, they could send

20 an email to the manufacturer saying we want to produce it

21 in this way now, and that would be directly relevant to

22 whether that ingredient is in fact natural or synthetic.

23          THE COURT:  All right.  Mr. Wolfson?

24          MR. WOLFSON:  What counsel just informed you or

25 described, is not what's alleged in the complaint.  The

Proceedings

1  complaint alleges that Mr. Silva on an unspecified date

2  purchased this product, and has the label that they

3  claim, and the ingredients are listed, and there are six

4  ingredients that they allege in the complaint, are in the

5  product, and that are allegedly synthetic and not

6  natural.

7          Whether the product had a different formulation

8  earlier when Mr. Silva didn't buy it, and whether it had

9  a different formulation later when Mr. Silva didn't buy

10 it, is just -- again, it's just irrelevant.  He says,

11 "When I purchased the product, these are the ingredients

12 and they allegedly are synthetic."

13          So the changes, if any, before, or the changes

14 if any, after, are irrelevant.

15          Second, there are six different ingredients

16 that they say are allegedly synthetic, and what I don't

17 understand is are they now saying that there's a specific

18 one of those ingredients, or more than one, that

19 depending upon how it was manufactured, may actually be

20 all natural and not synthetic?  And they may have made a

21 mistake when they alleged in the complaint that all of

22 those ingredients were synthetic.

23          Again, this is not the facts or the theory

24 that's alleged in the complaint.  This sounds like it's

25 an attempt to rewrite the complaint because they realized

1  that some of these ingredients must in fact not be

2  synthetic.

3          So again, it is not relevant to the claims that

4  they've asserted in the complaint -- and I should say the

5  amended complaint.  You know, they had an opportunity to

6  amend, and this is just not the claims that are alleged.

7          THE COURT:  So Mr. Francis, I'm looking at the

8  amended complaint, and the list of what you call

9  synthetic ingredients, and it seems to me your theory in

10 that amended complaint is that these ingredients are in

11 fact, not natural but synthetic, and so if you're

12 alleging that they are in fact synthetic, how they were

13 produced might be relevant to your argument about them

14 being synthetic rather than natural, but whether the

15 formulation changed over time, so that there was more

16 gelatin, for example, and less citric acid doesn't seem

17 to go to the issue that you've alleged.

18          And then, whether the -- who the manufacturers

19 were wouldn't matter either because I think Mr. Wilson

20 raises a good point, either you're saying that for some

21 manufacturers and their processes, these may be natural,

22 but for some, they would be synthetic.  If that's the

23 case, that actually hurts your case, and I'm not really

24 sure why you're alleging that because on its face, the

25 complaint says gelatin is synthetic.  You're not saying

Proceedings

1 there's a naturally occurring version of gelatin which I

2 assume might be what defense is saying, but you're not

3 saying that, so I am not really sure why you're trying to

4 get --

5             MR. FRANCIS:  Well, that's --

6             THE COURT:  -- this information, unless you're

7 trying to defend against that defense, I don't know.

8             MR. FRANCIS:  That's --

9             THE COURT:  But the defense has been brought

10 up --

11            MR. FRANCIS:  That's right.

12            THE COURT:  Yeah.

13            MR. FRANCIS:  That's right, your Honor.

14            THE COURT:  All right.  So --

15            MR. FRANCIS:  It would be relevant to a defense

16 that the ingredients are, in fact, natural, right --

17            THE COURT:  Okay.

18            MR. FRANCIS:  -- which we --

19            THE COURT:  So let me ask --

20            MR. FRANCIS:  -- anticipate will happen here.

21            THE COURT:  -- Mr. Wolfson.  Yeah, let me ask

22 Mr. Wolfson if you are saying that, so is one of the

23 defenses that these ingredients are natural, and that

24 that might -- there would be a difference between a

25 synthetic and a natural ingredient based on how it's

Proceedings

1  produced?

2         MR. WOLFSON:  Well --

3         THE COURT:  Because just based on my laymen's

4  understanding of ingredients, there may be -- gelatin may

5  well be naturally occurring, but if you isolate it and

6  put it into like a powdered form that you put in Jell-O,

7  then it may be not natural but I don't know.  Maybe it

8  still is natural even though it's in powder form, rather

9  than, you know, a naturally occurring process where you

10  cook bones, and then when you put it in the refrigerator

11  it gels.  So I'm not really sure what the situation is

12  here from the defendant's perspective.

13         MR. WOLFSON:  Well, your Honor, I guess first

14  because none of this is alleged in the complaint,

15  including that these ingredients may be natural depending

16  upon how their manufactured, this is not something that

17  has been at issue yet or that frankly, I've taken a deep

18  dive on.

19         I will tell you, because you ask our position,

20  our position is that every one of the ingredients and the

21  product as a whole is -- that calling it or labeling it

22  all natural is not misleading.

23         THE COURT:  Uh-hum.

24         MR. WOLFSON:  Okay.  It's not a specific

25  ingredient by ingredient defense that we have.  Our

Proceedings

1   position is that there's nothing misleading about calling

2   this product all natural, and so I don't think that the

3   manufacturing process, which again, none of it -- this is

4   is alleged in the complaint.  There's nothing that

5   would've ever put us on notice until this moment that

6   their claim now depends not on what the ingredients are,

7   but how the ingredients -- not the product, each separate

8   ingredient, how each separate ingredient was

9   manufactured, and so --

10          THE COURT:  And what I hear Mr. Francis saying

11  is that it's -- they're trying to pre-empt your defense,

12  and so they read into your answer, a defense that these

13  products are all natural, and that that could be based on

14  the manufacturing process, and so they're anticipating

15  perhaps how you're trying to prove your defense, that

16  they're natural, by showing that --

17          MR. WOLFSON:  Well, I --

18          THE COURT:  -- because of the process, they're

19  not natural anymore.

20          MR. WOLFSON:  Yeah, I hear that too, your

21  Honor.  I can only tell you that hasn't been alleged yet

22  in the case, it hasn't been an issue yet in the case.  We

23  haven't gotten to expert discovery involving the

24  ingredients, and how any of them are made or

25  manufactured, and so I can't today tell you whether when

Proceedings

1  we get to those issues, any of these six ingredients,

2  whether they're natural, or not natural, will be the --

3  based upon the manufacturing process.  It seems to me if

4  that does become relevant at some point, that we can

5  revisit this issue.

6           THE COURT:  Okay.  So then what might make

7  sense is if this becomes the subject of further

8  exploration, perhaps through interrogatories or other

9  means, to find out if in fact that is a defense, and if

10 it turns out that is a defense, then there might be a

11 basis for requesting this particular information.

12           So Mr. Francis, you may have jumped a few steps

13 ahead of yourself.  You may still be able to catch up, or

14 have everybody else catch up to you, but it may be too

15 soon to ask for this information if that defense, in

16 fact, is not being offered.  All right?

17           MR. FRANCIS:  Under --

18           THE COURT:  And the answer doesn't give me

19 enough information to show that that is in fact a

20 defense, so you would need to explore it a little bit

21 further and get more details on that.

22           MR. FRANCIS:  Understood, your Honor.

23           THE COURT:  All right.  So then the last piece

24 of your request was --

25           MR. FRANCIS:  I think there are two --

 1          THE COURT:  -- (audio interference).

 2          MR. FRANCIS:  -- yeah, two more --

 3          THE COURT:  Product (indiscernible)?

 4          MR. FRANCIS:  What's that?

 5          THE COURT:  I'm reading the last, you said

 6 finally, defendant objects to interrogatory 12.

 7          MR. FRANCIS:  We may have jumped over, and let

 8 me see the letter here, interrogatories 1, and 2, which

 9 may -- yes, interrogatories 1 and 2, which are

10 defendants' definition of natural, as well as defendants'

11 understanding as to what a reasonable consumer believes

12 the term all natural means, and defendants have declined

13 to answer those interrogatories, I believe on the basis

14 that, you know, it doesn't matter what Arizona thinks,

15 and it doesn't matter what they think a reasonable

16 consumer thinks.  Ultimately, what a reasonable consumer

17 thinks is the issue at trial.

18          Our position is what Arizona believes a

19 reasonable consumer thinks the term all natural means,

20 and how they define it themselves is directly relevant to

21 how a reasonable consumer thinks of the term all natural.

22 We plan -- we anticipate doing consumer surveys and

23 presenting expert evidence with regards to how consumers

24 interpret all natural, but certainly the company's own

25 definition and understanding of that is relevant, as

Proceedings

1   well.

2           THE COURT:  So the issue of all natural may

3   bear on the issue that we just talked about which is if

4   the defendant believes all natural can include certain

5   product -- certain ingredients, depending on their

6   manufacturing process, that might be an answer, or if

7   it's all natural because the ingredients are listed in

8   let's say FDA list of things that could be called all

9   natural, then that might be enough, so I think the first

10  part of the question might make sense, what the

11  definition is by the defendant itself.

12          The second one about what a reasonable consumer

13  thinks doesn't seem to be relevant because they are not

14  the arbiter of a reasonable consumer.

15          Mr. Wolfson, do you want to add anything to

16  that?

17          MR. WOLFSON:  Yes, your Honor, thank you.

18          The first interrogatory says what is your

19  definition of the term all natural used on the label.

20  Now they've noticed depositions of three of our employees

21  including the chairman of the company, and you know, that

22  is certainly an appropriate question for them to ask the

23  witness at a deposition, although I might take the

24  position if we ever have a trial, that's irrelevant, but

25  certainly, you know, you can ask a witness.

Proceedings

1         But to propound an interrogatory for us to give

2    some all-inclusive or uniform definition that would be

3    binding on every witness, I don't think that's a proper

4    use of an interrogatory.  They've asked for the witnesses

5    who made the decision to use the all natural on the

6    label, and we're giving them those witnesses, and they

7    can ask that question at deposition.

8         THE COURT:  Well, but for purposes of getting

9    information about the defendant, and here the defendant

10   is a corporation, so they're -- and the corporation made

11   a decision to put the label all natural on that product,

12   so I think it's a fair question even if there are

13   individuals who can answer the question, to find out the

14   official corporation position policy basis for using that

15   term on this product.

16        You're right, it is a proper topic for a

17   deposition but it doesn't make it an improper topic for

18   interrogatory to get a clear definition, or a simple

19   definition that is what the corporation was thinking when

20   this decision was made, and it will also assist in the

21   further discovery that we just talked about which is if

22   there is a definition that -- I can just, off the top of

23   my head, think of different ways this could go, right?

24   The answer could be we rely on a list of products or

25   ingredients that we're permitted to call all natural,

Proceedings

1    because the government has told us to, a regulator has

2    said it's proper, or you can say we do investigations

3    into this, and these other criteria were used and among

4    the criteria could be manufacturing processes or maybe

5    not.

6            So you may rely on some in-house experts or

7    outside experts who tell you, that's fine, you can call

8    that natural because it's naturally occurring.

9            So you know, to get that information in

10   advance, I think will assist in the deposition because it

11   will enable there to be further document discovery if

12   necessary, so by the time everybody gets the deposition

13   it's pretty clear what is going on, and what further

14   questions and clarifications may be necessary.

15           So that first question about the defendants'

16   definition of all natural seems quite proper.

17           MR. WOLFSON:  Can I just briefly just address

18   that --

19           THE COURT:  Yeah.

20           MR. WOLFSON:  -- and I certainly hear your

21   Honor.  If what on earth the phrase all natural or

22   natural meant, you know, was clear, we wouldn't have any

23   of these litigations.  Unfortunately, the FDA's so far

24   refused to clarify them.  If you go online, and you

25   Google what is an all natural product, you'll find

Proceedings

1 articles saying, you know, nobody really knows what the

2 heck it means.

3          THE COURT:  It --

4          MR. WOLFSON:  This interrogatory question,

5 "What is your definition of the term all natural" pre-

6 supposes that the company has a company uniform

7 definition of the term all natural and that it's because

8 of that definition that the phrase all natural is on the

9 product, and what I am saying to you, your Honor, is that

10 my -- I believe my three witnesses will give different

11 answers to that question and they're answers that are

12 based on their personal view of what that term means, and

13 it may have absolutely nothing to do with why that phrase

14 is on the product.

15          THE COURT:  Right.  So then if I could try to

16 resolve this issue by rephrasing the interrogatory to say

17 what is the basis on which the defendant put this phrase

18 on this product.

19          MR. WOLFSON:  Or your Honor, if it says does

20 your company have a definition of the term all natural

21 used on the label --

22          THE COURT:  Well --

23          MR. WOLFSON:  -- and if so, what is it?

24          THE COURT:  Well, yes, but you told me there

25 isn't one and so what I am trying to get at is --

1          MR. WOLFSON:  No.

2          THE COURT:  -- why is it --

3          MR. WOLFSON:  No, your --

4          THE COURT:  -- obviously, it's undisputed that

5    this label says all natural, so somebody had to decide to

6    put it there, and so the question can simply be limited

7    to how the heck did this phrase get on the label?  It

8    says all natural, I'm looking at it right now, and so

9    someone put it there, and whoever put it there, if it's a

10   vice president of fruit snacks or whatever it is, or some

11   other person who said great, we can do that, had to have

12   a basis for it, and so that's the person -- that's the

13   person who should be asked, how did this label get on

14   there.

15          Now if it turns out, again, I am just making

16   things up as a hypothetical that no one made that

17   decision, that a marketing person said that would sound

18   really nice, let's put it there, then that's important to

19   know too but I think --

20          MR. WOLFSON:  Well, but I want to make really

21   clear --

22          THE COURT:  -- how it got there --

23          MR. WOLFSON:  No, no, and I understand that.

24          THE COURT:  -- is an important question, right?

25          MR. WOLFSON:  No, I don't have a problem with

1  that.  I'm just saying I don't want you to misunderstand

2  anything I'm saying.  What I am saying is two people may

3  have discussed putting that phrase on the label, and each

4  of those people or persons, may have a different

5  understanding about what all natural means, and I'm

6  simply suggesting that neither one of their definitions

7  of what that phrase they personally believe means, may

8  explain why it's on the box.

9        THE COURT:  But somebody authorized it.  It's

10  there.  So if those people --

11        MR. WOLFSON:  I don't -- I can't --

12        THE COURT:  -- disagree --

13        MR. WOLFSON:  -- (audio interference) dispute

14  that, Judge, yeah.

15        THE COURT:  Yeah, so if those two people

16  disagree, that highlights to me why this is an important

17  question to pose not to those two individuals in a

18  deposition but in an interrogatory where your client can

19  explore the question how did this word get on there when

20  people disagree about it, and then you can have someone

21  say I'm the one, or someone can answer it, that the

22  decision was made because on the whole, this was the

23  reason, the analysis, even if there's disagreement.

24        So it doesn't have to be that everybody in the

25  company agrees, that's the whole point, but someone made

Proceedings

1   the decision notwithstanding any disagreement, that this

2   is the -- these are the words that would be on this

3   product, so that's why it's an important and relevant

4   topic for an interrogatory, so that the company can

5   say --

6           MR. WOLFSON:  That's a --

7           THE COURT:  -- someone put it there, and this

8   is the reason why.

9           MR. WOLFSON:  Judge, I am not quarreling with

10  anything you said.

11          THE COURT:  Um-hum.

12          MR. WOLFSON:  I'm simply responding to why this

13  interrogatory, as it was propounded, we thought was --

14          THE COURT:  Yeah.

15          MR. WOLFSON:  -- an objectionable

16  interrogatory.

17          THE COURT:  Yes, yes.  And I understand why it

18  may be a difficult interrogatory to answer but I think

19  it's relevant, so you should answer it.

20          MR. WOLFSON:  That's also, Judge, why I just

21  suggested, if we're having these people at depositions

22  and we've agreed to produce them --

23          THE COURT:  So I know --

24          MR. WOLFSON:  -- why they can't be (audio

25  interference) --

Proceedings

1          THE COURT:  -- Mr. Wolfson, but what you've

2    already told me is that these people may disagree.  So

3    when there's a disagreement, it still will not answer the

4    question as to why this product was labeled all natural.

5          MR. WOLFSON:  Judge --

6          THE COURT:  You need to have an answer for

7    that.

8          MR. WOLFSON:  -- they may --

9          THE COURT:  Somebody made the decision.  You

10   need to --

11         MR. WOLFSON:  Judge, (audio interference) --

12         THE COURT:  -- to have an answer.

13         MR. WOLFSON:  I will say this Judge --

14         THE COURT:  I don't mean you, Mr. Wolfson, I

15   mean your client.

16         MR. WOLFSON:  Yeah, I mean, I don't know what

17   each will say.  I sure hope they don't disagree with each

18   other.

19         THE COURT:  Well, then that's just the nature

20   of representing a corporation.  You'll get it --

21         MR. WOLFSON:  And (audio interference) --

22         THE COURT:  -- figured out, and figure out what

23   the proper answer is.

24         MR. WOLFSON:  Yeah, I just thought this --

25   again, we're talking with this particular interrogatory,

Proceedings

1  why we objected, and I thought --

2          THE COURT:  I know, I --

3          MR. WOLFSON:  -- our objection was well-

4  founded, yeah.

5          THE COURT:  I understand that you had a valid

6  objection and I have weighed the need and relevance of

7  the interrogatory, and -- as well as your objection and

8  on a whole, I think you should answer it because I think

9  it's relevant, and important.

10          MR. WOLFSON:  Judge, should we answer it in

11  this -- as it's right here then.

12          THE COURT:  The -- no, I think it should be

13  phrased in the more narrow way of how was all natural

14  defined was defined as it pertains to this product, not a

15  company-wide definition because it may be that there is a

16  disagreement across product lines as far as all natural

17  but all we're talking about is this product.

18          MR. WOLFSON:  Okay, Judge, (audio

19  interference) --

20          THE COURT:  If it turns out in -- again, in the

21  exploration of this issue, if it turns out that there's

22  relevant information that causes other products to become

23  relevant, you can revisit -- plaintiff can revisit it but

24  based on what I've heard now, the only relevant product

25  is this product.

Proceedings

1          MR. WOLFSON:  We understand your Honor --

2          THE COURT:  All right.  Mr. Francis, do you

3    understand --

4          MR. WOLFSON:  -- thank you.

5          THE COURT:  -- that --

6          MR. WOLFSON:  Yes.

7          THE COURT:  All right.  And Mr. Francis, I have

8    rephrased your interrogatory and directed to --

9          MR. FRANCIS:  Understood.

10         THE COURT:  -- answer just that question.

11         MR. FRANCIS:  Understood, your Honor.

12         THE COURT:  All right.  I believe that the last

13   interrogatory at issue is interrogatory 12 where we asked

14   for information in defendants' possession regarding the

15   identity of their consumers -- of this particular

16   product.

17         I will -- I think the important thing here is

18   not necessarily for them to provide that information,

19   although that is what the request asks for.  I think it's

20   more important to disclose whether or not they have that

21   information and that is important to class certification

22   and specifically to ascertainability.

23         Again, we're anticipating a potential defense

24   wherein they tried to argue that the class is not

25   ascertainable because they do not sell directly to the

1 consumer, they sell to retailers, and they don't have

2 access to the retailer records regarding to whom these

3 products were sold.

4          So that's really the information that we're

5 trying to get is do they have information and what

6 information do they have regarding the end purchasers of

7 this product.

8          THE COURT:  And Mr. Wolfson, what's the

9 objection, that it's not relevant, or you don't possess

10 it?

11          MR. WOLFSON:  Judge, what they're asking about

12 is Arizona has a website on which you can go -- a

13 consumer can go and buy certain products and they've

14 asked us to give them the names, address, telephone

15 numbers, and other contact information for anyone who

16 went on that website and purchased the product.  And

17 we've objected to it because we think it's irrelevant if

18 at some time, we get to class certification, and they say

19 they need this information in order to give notice to the

20 class members, or if at that point, we say you can't

21 ascertain the class because we don't know who bought it

22 from us, all right, then I would understand its relevance

23 but they're asking us now to give them, you know,

24 confidential information that people might give us if

25 they purchase this product online; their name, their

1  address, their telephone, their confidential information.

2        And what's the purpose at this point?  At this

3  point, we're not at class certification, and when we get

4  there if, in fact, it becomes relevant again, we can

5  determine if we've got that information, and they get a

6  class certified, I assume we'll be ordered to give them

7  that information.  I think it's not relevant at this

8  point though.

9        THE COURT:  So can you read to me what exactly

10 interrogatory 12 says?

11        MR. WOLFSON:  It says, "List the names,

12 addresses, telephone numbers, and other contact

13 information of all consumers that purchased the product

14 during the applicable time period."

15        THE COURT:  Okay.  So what I heard -- Mr.

16 Francis asks for or the relevance argument that Mr.

17 Francis was making, was asked to the ascertainability, so

18 it seems to me the only question to be asked at this

19 point is does the defendant have access to the

20 information of who purchased the product and if it's

21 limited to the website, you can say yes, limited to the

22 website.  If you have other consumer information somehow,

23 you can identify the sources, and then as you said, Mr.

24 Wilson, not provide the details until later, but being

25 able to identify the sources would be enough for the

Proceedings

1  plaintiff to make an ascertainability argument for class

2  certification purposes, okay?

3          So it seems to me asking for whether the

4  defendant has the sources, and what types of lists they

5  may have access to would be enough to provide to a court,

6  as far as whether the class is ascertainable, if a class

7  is certified, then as Mr. Wolfson stated, then the

8  details can be turned over.

9          But at this point, all you will need to know is

10  what are the potential sources, you've talked about the

11  website, if there are others that might be a fruitful

12  exercise to list where those things are, if they were

13  rebate programs or other promotional things where you

14  have access, that might be the way to go.  All right?

15          MR. WOLFSON:  Yes, your Honor.

16          THE COURT:  Is that clear, Mr. Francis?

17          MR. FRANCIS:  Yes, your Honor.

18          THE COURT:  And Mr. Wolfson, please provide

19  that.  All right.

20          MR. WOLFSON:  Yes, your Honor.

21          THE COURT:  All right.  So I think that takes

22  care of all the deficiencies that plaintiff has

23  ascertained.  Now let's turn to defendants.  So Mr.

24  Wolfson, you've said that you have not gotten anything

25  rom the plaintiff that you asked for?

1    MR. WOLFSON:  No, your Honor.  We haven't

2  received anything, and I want to say that that includes

3  the most basic requests that they obviously knew we would

4  make, which is there's this very vague allegation that

5  the plaintiff purchased this product during some month,

6  and then in an interrogatory answer, they told us he

7  purchased it on Amazon.

8         We've asked for the date, what he purchased,

9  what he paid, and most importantly, the receipt or other

10  proof that he actually made a purchase of this product.

11         THE COURT:  All right.  So let me just ask

12  of --

13         MR. WOLFSON:  And all we've received -- I'm

14  sorry.  Go ahead, your Honor.

15         THE COURT:  That's fine.  Let me just find out

16  from Mr. Francis, when did your client purchase this

17  product and was it online or was it in person?

18         MR. FRANCIS:  It was online, as alleged in the

19  complaint.  I believe we provided the month of October

20  2000- -- I don't know --

21         THE COURT:  Right, but --

22         MR. FRANCIS:  -- but it was 2019.

23         THE COURT:  Let me look at the complaint.

24         MR. FRANCIS:  Sure, yeah, tell me when --

25         THE COURT:  You said online, was it through

Proceedings

1  Amazon?

2      MR. FRANCIS:  Yes, and that's --

3      THE COURT:  Okay.  Amazon has very good

4  records.  Why can't you go through -- why can't your

5  client go back and get his order?

6      MR. FRANCIS:  He has been doing so, your Honor,

7  and to the extent that he can --

8      THE COURT:  It's very simple.

9      MR. FRANCIS:  I understand.

10      THE COURT:  It's very simple.

11      MR. FRANCIS:  We --

12      THE COURT:   That's the beauty of Amazon.

13      MR. FRANCIS:  We have not objected to producing

14  those documents --

15      THE COURT:  No, but you need to produce them.

16      MR. FRANCIS:  -- if he was able to locate them.

17      THE COURT:  Why can't he (audio interference)?

18      MR. FRANCIS:  I understand but -- because -- I

19  don't know why he wouldn't be able to locate them.  I

20  can't honestly --

21      THE COURT:  Well --

22      MR. FRANCIS:  -- answer that question.

23      THE COURT:  Yeah, so please --

24      MR. FRANCIS:  But we tried to agree --

25      THE COURT:  I (audio interference) I am a

1   consumer that on Amazon, it is extremely simple, so there

2   should be no reason in the world.  You can't even erase

3   it.  It's there.  Right?

4           MR. FRANCIS:  Understood, your Honor.

5           THE COURT:  So you need to (audio

6   interference) --

7           MR. FRANCIS:  And --

8           THE COURT:  -- make this immediately.

9           MR. FRANCIS:  We've not objected to producing

10  that.  We had --

11          THE COURT:  Well, why hasn't --

12          MR. FRANCIS:  There are, in fact, several

13  categories here -- because we've tried to --

14          THE COURT:  Why hasn't it been produced?

15          MR. FRANCIS:  Because we've tried to agree on a

16  date for mutual production with the defendants with

17  regard to these documents, and you know, there are also

18  documents, they're noted in the letter, several

19  categories of documents that they have agreed to produce

20  that we've not seen at this point.

21          THE COURT:  But you can't -- no, no, no, no,

22  no.  You cannot hold up your production as a bargaining

23  chip for the other side's production.  You filed your

24  amended complaint May 19th.  We are now in December.  Not

25  to turn over basic information like when the product was

Proceedings

1  purchased, and through what means, and how much he paid

2  for it, is so basic, that should have been turned over in

3  the initial disclosures.  So you need to turn that over

4  immediately.

5          All right.  Mr. Wolfson --

6          MR. FRANCIS:  Understood, your Honor.

7          THE COURT:  -- what else?

8          MR. WOLFSON:  Well, your Honor, just -- I'm

9  going to follow our letter because I listed the

10  interrogatories and document requests by number, that

11  addresses number 2 and number 11, which where we asked

12  for the price, the date of purchase.

13          We also asked in number 2 for the plaintiff's

14  computation of his alleged damages which again, we're not

15  asking for the classes damages, we're asking Mr. Silva

16  says I've paid X for this product but I could have bought

17  an unspecified comparable product that didn't say all

18  natural (indiscernible).

19          So we've asked him what product are you

20  referring to?  Tell us so we see what your damage theory

21  is.  It may turn out that this so-called comparable

22  product costs more.

23          THE COURT:  So can I just take a step back from

24  this?  What I heard Mr. Francis say earlier was that they

25  are not actually objecting to turning over this

Proceedings

1  information or answering the interrogatory.  They're

2  trying to figure out a time to do that.

3            MR. WOLFSON:  That's the --

4            THE COURT:  Is that (audio interference), Mr.

5  Francis?  And if that's the case, let's just figure out a

6  time and then you'll turn over all the information,

7  right?

8            MR. FRANCIS:  Well, that's with regard to the

9  -- any receipt, computer records of the purchase which

10  would obviously include information about the date of the

11  purchase, the price of the purchase.  I think what

12  defense counsel is asking about now is that the complaint

13  alleges that the damage is a price premium, that he paid

14  -- that the plaintiff paid more for this product than he

15  otherwise would have, had the all natural representation

16  not been on the label, and they've asked in a couple of

17  interrogatories and document requests for information

18  specifically about well, what is the price premium, how

19  much more did he pay, and what product would he have

20  otherwise purchased?  What is a comparable product?  And

21  our response to that is that that's a misunderstanding of

22  the damages theory here.  It's not about any specific

23  comparable product.  It is about a hypothetical Arizona

24  gummy chews product that did not have the labeling of all

25  natural on it.

1          THE COURT:  Right.  And how much would he have

2   paid for --

3          MR. FRANCIS:  So I think that's where we're at

4   a disconnect here.

5          THE COURT:  How much would he have paid for

6   that hypothetical product?

7          MR. FRANCIS:  I don't think that's a question

8   that he can calculate at this point.

9          THE COURT:  But then how do you calculate

10  damages?

11         MR. FRANCIS:  We calculate damages based on a

12  class-wide basis.  You can do it through --

13         THE COURT:  Well --

14         MR. FRANCIS:  -- survey --

15         THE COURT:  -- but you do it --

16         MR. FRANCIS:  -- a content analysis --

17         THE COURT:  -- hold on.  Wait, hold on a

18  second.

19         MR. FRANCIS:  Sure.

20         THE COURT:  The class-wide basis would be to --

21  you would take one person and then you could extrapolate

22  but if the one person can't even put a number on it, he's

23  sort of consumer number one, or consumer zero, let's say,

24  for your survey.  So why can't he answer that question?

25         MR. FRANCIS:  I mean, he could probably answer

1    that question with a range.

2              THE COURT:  All right.  Well, then answer the

3    question with a range.

4              MR. FRANCIS:  That's fine, your Honor.

5              THE COURT:  All right.  Let's move on.

6              MR. WOLFSON:  We --

7              THE COURT:  We're running out of time.  I've

8    got another conference coming up, so can you please try

9    to group your arguments, so we can get through as much as

10   possible (audio interference).

11             MR. WOLFSON:  Yes, your Honor.  Let me just ask

12   quickly to that one issue.  Again, the complaint alleges

13   that there are comparable products that cost less that he

14   could've purchased.  If counsel is now saying that that

15   was just a hypothetical, that that was just a

16   hypothetical, then I don't know how you file a complaint

17   that says that I purchased a product and paid more

18   because it said all natural when the plaintiff at the

19   time he filed, didn't even know what the price was of

20   this alleged comparable product.  So --

21             THE COURT:  All right.

22             MR. WOLFSON:  -- this is one that (audio

23   interference) --

24             THE COURT:  Mr. Wolfson, you can ask the

25   question.  I'm sure you can ask the question or rephrase

Proceedings

1  the question in a way that gets you that answer, all

2  right?

3          MR. WOLFSON:  Okay.

4          THE COURT:  So if the question is is there a

5  comparable product, and if Mr. Francis answers

6  consistently with what he said today, no, then you can

7  follow-up with what is the range, which I think Mr. -- a

8  price that he would've paid and Mr. Francis has said he

9  can answer that question.

10          So please parse it out if you want to rephrase

11  the question so that it addresses what you now understand

12  Mr. Francis to be saying.

13          MR. WOLFSON:  Okay.  Judge, we've also asked

14  for his employment history.  I think it's relevant what

15  his prior employment and experience is to his adequacy as

16  a class representative, as well as to his -- whether he

17  was really misled because we understand that some of his

18  prior employment, he may have actually worked in the

19  industry as a creative designer on products that were

20  labeled by clients he worked for as natural.

21          THE COURT:  All right.

22          MR. WOLFSON:  He's refused to --

23          THE COURT:  So --

24          MR. WOLFSON:  -- disclose his --

25          THE COURT:  Okay.  Sorry to interrupt you.  So

Proceedings

1   what I hear you saying is that the issue of his prior

2   employment is important to figure out if he -- his level

3   of sophistication in terms of understanding the product

4   label all natural, is that right?

5           MR. WOLFSON:  Correct.

6           THE COURT:  Okay.

7           MR. WOLFSON:  Correct.

8           THE COURT:  So why is that not relevant, Mr.

9   Francis?

10          MR. FRANCIS:  Well, it is relevant except that

11  they've asked for his entire employment history.  They've

12  also subpoenaed his current employer, and the danger here

13  is that they're going -- they're essentially going to use

14  this to subpoena and harass his former employers, when

15  what they should be doing is simply asking in

16  interrogatory, narrowly-tailored interrogatory, as to

17  whether he has done work on campaigns that feature the

18  terms natural or all natural.  And that answers their

19  question and is directly relevant to what they're trying

20  to get at.

21          THE COURT:  Okay.  So you should turn over your

22  client's employment history, and if there's any harassing

23  action, you can bring it to the Court's attention, and

24  tell me why it's harassing, all right?  Let's move on.

25          MR. WOLFSON:  Your Honor, the next issue and

Proceedings

1  this is really the central issue for us in this case, is

2  Mr. Silva previous brought another purported class action

3  against Smucker's, claiming he was misled there to

4  purchase a product because he didn't understand what

5  natural meant, and this was several years ago.

6          He was represented in that case by Joseph

7  Lipari, who is his counsel in this case.  Mr. Lipari is

8  his brother-in-law.  Mr. Lipari also represents Mr.

9  Silva's girlfriend in yet another consumer class action.

10         We believe, and Judge Ross just sustained our

11 affirmative defense which is the letter I sent to you, we

12 believe that at the time that Mr. Silva purchased this

13 product, he purchased it for the purpose of asserting

14 this lawsuit and not because he was misled.  And we've

15 asked for the communications that he had prior to this

16 lawsuit being filed with Mr. Silva and other third

17 parties about whether to go and purchase this product.

18         We can (audio interference) --

19         THE COURT:  Wait, I'm sorry.  Communications

20 between?  I'm sorry, you said between Mr. Silva and whom?

21         MR. WOLFSON:  And Mr. Lipari, as well as --

22         THE COURT:  Lipari.

23         MR. WOLFSON:  -- any other third parties, for

24 example, he might've had a communication with his -- Mr.

25 Silva might have had a communication with his wife, who

Proceedings

1   is Mr. Lipari's sister, where it was discussed that he

2   should go and purchase this product online, so that they

3   could file this lawsuit.

4              THE COURT:  All right.  So the request for

5   document -- tell me the number?

6              MR. WOLFSON:  It's --

7              THE COURT:  13.

8              MR. WOLFSON:  -- number 3, number 3, number 13,

9   and number 36, the document requests.

10             THE COURT:  Okay.

11             MR. WOLFSON:  And 37 --

12             THE COURT:  Right.

13             MR. WOLFSON:  -- which is whether he had any

14  similar conversations or communications with any other

15  law firm.

16             THE COURT:  Right.  Okay.  So Mr. Francis?

17             MR. FRANCIS:  Your Honor, I think ultimately,

18  we can answer those questions because the answer is going

19  -- is simply going to be none.  So I think --

20             THE COURT:  All right.

21             MR. FRANCIS:  And I think that that's something

22  that we -- there are several of these document requests

23  that are raised in the letter that were the subject of

24  meet and confers prior to this, that I believed we had

25  already agreed to supplement our responses to indicate

Proceedings

1  that no such documents existed, and that would include

2  these requests.

3          THE COURT:  Okay.  So then let me -- I heard

4  the parties in the next conference -- the 3:30 conference

5  join the line, so please be patient as I finish up this

6  conference.

7          So in the interest of trying to be efficient

8  here, Mr. Francis, are there interrogatories remaining to

9  which you are not supplementing, to which you maintain

10  your objection, so that we can discuss what your

11  objections are?

12          MR. WOLFSON:  As to --

13          MR. FRANCIS:  I don't --

14          MR. WOLFSON:  -- (audio interference) document

15  request two --

16          MR. FRANCIS:  Go ahead.

17          MR. WOLFSON:  I'm sorry, I didn't mean to --

18  but document request two, because there's only three

19  interrogatories that were at issue, there were more

20  document requests.

21          THE COURT:  Okay.  I didn't mean to limit it to

22  interrogatories, but I meant all the requests.

23          MR. WOLFSON:  Okay.  I'm sorry, your Honor.

24          MR. FRANCIS:  No, your Honor, I don't actually

25  believe there are.

Proceedings

 1          THE COURT:  So you'll be supplementing all the

 2  remaining document requests?

 3          MR. FRANCIS:  I believe that's correct,

 4  including -- I think they have asked for -- I want to

 5  cabin that a little bit.  There are requests they have

 6  made that would include -- for example, they have made

 7  requests regarding documents related to the prior action

 8  in which our firm represented Mr. Silva.

 9          We will produce those documents that are in Mr.

10  Silva's possession, to the extent that they're not

11  privileged communications, and I think that goes for the

12  -- some of the other communications that we've agreed to

13  produce as well.

14          THE COURT:  All right.

15          MR. FRANCIS:  I understand that the defense

16  counsel is asking for things prior to the engagement as

17  counsel, and that's fine, but after he was -- after we

18  were retained, I think, we're going to object to those on

19  privilege grounds.

20          THE COURT:  So Mr. Francis --

21          MR. WOLFSON:  Right, but let me just --

22          THE COURT:  -- for every -- wait, hold on.  So

23  Mr. Francis, if you're saying that there are privileged

24  documents, you need to create a privilege log, all right?

25  And if there are other objections that you're interposing

Proceedings

1 -- actually, so you need a privilege log number one.

2 Number two, it's not just possession, it's possession,

3 custody or control --

4          MR. FRANCIS:  Yes.

5          THE COURT:  -- of anything that is still within

6 the control of your client is subject to this request.

7          Mr. Wolfson, you started to say something?

8          MR. WOLFSON:  Yes, your Honor.  There's just

9 one -- there's one distinction that's very important.

10 We've asked for materials that he received in the

11 Smucker's action after he started the action because

12 these materials will show, we believe, the education that

13 he received in that action, about what is, and what is

14 not an actual product.

15          And so the materials that he received, whether

16 they were articles, pleadings, potential expert

17 materials, but all discussions that he was having about

18 what is or isn't a natural product goes to the heart

19 again of this defense that this is not a consumer that

20 could have been misled to buy this product.  This is a --

21 as Judge Ross said, a unique set of facts where someone

22 who says, you know -- it's like the old saying, fool me

23 once, you know, good for you.  We don't think he could've

24 been fooled, that he received an education but I need the

25 documents that he received that show the education,

1  otherwise what I can cross-examine him with?

2         THE COURT:  Yes, and so I hear the -- Mr.

3  Francis say that he will go through the materials, and I

4  have told him that if he's withholding anything based on

5  privilege, he needs to make a privilege log, so we know

6  exactly what's being withheld, and then we can go -- if

7  there's a dispute on that, we can go through each of the

8  items to see whether they are, in fact, privileged or

9  not, and whether they go to this issue that you're

10  talking about, receiving the education, as opposed to

11  receiving legal advice.

12         MS. POLLACK:  Your Honor, can I ask --

13         MR. WOLFSON:  Thank you, your Honor.

14         MS. POLLACK:  I'm sorry, this is Gayle Pollack.

15         THE COURT:  Yes, Ms. Pollack.

16         MS. POLLACK:  May I ask one further

17  clarification and I apologize, I know you're (audio

18  interference).

19         THE COURT:  No, no problem.

20         MS. POLLACK:  Mr. Francis was very clear that

21  he will produce documents in Mr. Silva's possession.  You

22  know, I am wondering if that should be clarified to

23  include documents, you know, nonprivileged documents in

24  his counsel's possession that might have been provided

25  because for example, I can easily see -- Mr. Silva having

Proceedings

1 received documents in 2016, when he filed the Silva case,

2 not maintaining copies of those documents obviously, but

3 his attorney would certainly have possession of the

4 discovery from the Smucker's case.

5      So I just wasn't sure whether Mr. Silva --

6 whether Mr. Francis was trying to be very clear that he

7 was only producing documents, you know, from Mr. Silva --

8      THE COURT: Yes.

9      MS. POLLACK: -- as opposed to his law firm.

10 Thank you.

11      THE COURT: Yes, and that's a good point, Ms.

12 Pollack, which is why I clarified by saying "custody or

13 control" because they would still be within his control,

14 even though his counsel has them. So that's how I would

15 be interpreting that, that those are documents that are

16 part of Mr. Silva's file. So even though his client --

17 his lawyer has the documents currently, they're still --

18 they still can be seen as Mr. Silva's documents.

19      MS. POLLACK: Thank you, your Honor.

20      THE COURT: So that was a good point, Ms.

21 Pollack.

22      Mr. Francis, understood?

23      MR. FRANCIS: Understood.

24      THE COURT: All right. And Mr. Wolfson, I

25 don't want to rush you in a way that we don't get to

Proceedings

1  everything you need.  Is there anything else that we
2  haven't touched on that you need to bring up now?
3          MR. WOLFSON:  No, Judge, and I understand
4  you're already over the time limit and so thank you very
5  much for your time today.
6          THE COURT:  All right.  So I have been taking
7  notes but I think the parties have also been taking
8  notes, so you should be clear on what should be produced
9  and how.  I think there was a request for a time frame.
10 So why don't we say -- well, Mr. Wolfson, why don't I ask
11 you, when do you think you'll be able to produce the
12 requested documents and interrogatory responses, the ones
13 that should be produced?
14         MR. WOLFSON:  Judge, just because we're heading
15 into the holidays, and also the unique circumstances
16 where it's so difficult right at the moment to have
17 clients find things because they're in and out of the
18 office, I guess I would like to have till the first week
19 in January.
20         THE COURT:  Okay.  January 8th?
21         MR. WOLFSON:  Yes, that would be great.  Thank
22 you.
23         THE COURT:  And is that a good date for you, as
24 well, Mr. Francis?
25         MR. FRANCIS:  That's fine, your Honor.  Thank

1    you.

2           THE COURT:  Okay.  So January 8th for both

3    sides to produce the documents and interrogatory

4    responses that I've compelled, and any supplements that

5    you've promised.  Okay.  Thank you, everybody.

6           If there are other issues that need to be

7    raised, please put them in another filing and we'll get

8    to it.  I do apologize that I didn't allot enough time to

9    perhaps fully and in great depth, go through all of your

10   concerns, so if there's anything confer and see if they

11   need my attention and I will invite you to file a

12   supplemental request if we've missed anything.

13          MR. WOLFSON:  Thank you, Judge.

14          THE COURT:  All right.  Thank you, everybody.

15          MS. POLLACK:  Thank you.

16          THE COURT:  Stay safe.  I'm going to turn off

17   this recording and then we'll get back on the record for

18   the next case.

19                    (Matter Concluded)

20                        -o0o-

21

22

23

24

           C   E   R   T   I   F   I   C   A   T   E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **5th** day of **January** 2021.

*Linda Ferrara*
Linda Ferrara

AAERT CET 656
Transcriptions Plus II, Inc.